IN

## THE SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW-YORK,

IN MAY TERM, 1816, IN THE FORTIETH YEAR OF OUR INDEPENDENCE.

---

GRACIE *against* THE NEW-YORK INSURANCE COMPANY.

THIS was an action on an open policy of insurance, dated the 8th of *May*, 1807, on the cargo of the *American* ship *Mary*, *Richards* master, on a voyage " at and from *New-York* to *Antwerp*; if blockaded, to a port not blockaded," " upon coffee in casks, sugar, and ashes." " Warranted not to abandon, if captured, until condemnation, or until after a detention of six months after advice is received of her capture. The exporter, not the importer." The cause was tried at the *New-York* sittings, before Mr. Justice *Yates*, in *May*, 1814, subject to the opinion of the court, on a case, with permission to either party to turn the

*Insurance on a cargo " from New-York to Antwerp" During the voyage, the ship was boarded by a British privateer, and carried in to Portsmouth, in England, and, after a short detention, was released, and, on arriving in Flushing roads, an armed force was put on board, and continued until her arrival at Antwerp,*

on the 21st of *July*, 1807, where she was not suffered to land her cargo, nor to depart with it, the armed force being kept on board by the officer of the customs. On application by the consignees, leave was obtained from the *French* government, through its ministers, to land the cargo, under the direction of the officer of the customs, on condition of its being placed in *depot*, in the custom-house stores, until the decision of the Emperor of *France* could be obtained. After remaining in this state of sequestration until 1810, the cargo was sold by order of the emperor, and the proceeds paid into his *caisse d'amortissement*. Held that there was a total loss of the cargo, by the *arrest, restraint*, and *detainment* of the *French* government.

X

same into a special verdict. The case, however, instead of sta-, ting the facts as they would have been found by the special verdict of a jury, set out all the *evidence*, consisting of depositions, letters, &c., *in hæc verba*.

The following are all the parts of the evidence it is thought material to state :

The master, in his deposition, stated, that the ship sailed on the voyage insured, the 10th of *May*, 1807. On the 10th of *June*, she was boarded by an *English* privateer, and carried into *Portsmouth*, in *England*, where the master made his protest : and being released by an order of the court of admiralty, he sailed on the 11th of *July*, and arrived in *Flushing* roads on the 14th of *July*, when they took on board a pilot. An armed force was put on board, which continued on board until the ship reached *Antwerp*, and until the cargo was landed. There were two or three ships of war lying in *Flushing* roads at the time the *Mary* entered there ; and she could not have gone to sea again without being boarded by some of them. The armed force which came on board, inquired of the master, whether he had been in *England*, and he answered, that he had been captured and carried in there. Nothing was said about his being allowed to enter and land his cargo at *Antwerp*; nor was he warned not to go there, or to any other port. The master stated, that he had no control over his ship, nor the power of directing where she should go, until after the cargo was landed. That when the ship arrived at *Antwerp*, the custom-house officers, in consequence of the ship having been carried into *England*, kept the armed force on board of her, and refused to give permission to land the cargo, until the 25th of *August*, when permission was received, as he understood, from *Paris*, to land the cargo, on condition that it should be deposited in the stores of the custom house, which was, accordingly, done. The armed force on board he believed to be *Frenchmen*, but he neither understood nor spoke *French* or *German*. On his cross examination, he verified a protest made by him at *Antwerp*, and stated, that several *American* ships were at *Antwerp*, in the same situation, none of which left that place with their cargoes. He never inquired of the consignee, or any other person, whether he could depart with his cargo, but waited for orders for landing it, and did land it, in pursuance of orders received from the consignee, on the 25th of *August*, and returned to *New-York* with the ship in ballast. The

clerk of the consignees, and a custom-house officer, also, took an account of the landing of the cargo; and the clerk gave a receipt on his set of the bills of the lading. That he had no communication with the custom-house officers at *Antwerp* before landing his cargo; he did not remember whether he entered his ship, or not, before he had orders to land his cargo; that he knew nothing of any permission from *Paris* to land it; that he acted in pursuance of orders from the consignees, by whom he was directed to land it. He did not know for what purpose the armed men were put on board, but supposed it was to guard the vessel; nor did he recollect their number, nor whether the same men who came on board at *Flushing* continued to *Antwerp*; they might have been the same or others. He knew nothing of any arrangement between the consignees and the *French* government about landing the cargo, nor of the terms or conditions on which it was landed. That he did not know the reason why he did not state, in his protest, that the vessel was taken possession of by an armed force in *Flushing* roads, but supposed that he did not think it necessary. Several of the master's answers, in this respect, to the questions put to him, appeared confused and inconsistent.

*Jacob Ridgeway*, who was the *American* consul at *Antwerp*, and resided there from 1801 to 1808, and, afterwards, at *Paris*, until 1810, deposed, that the *Mary*, and several other ships, which he specified, arrived at *Antwerp*, in 1807, and had either been boarded by *English* vessels, or touched at *English* ports, and some of them were consigned to his house. That they were not permitted to depart with their cargoes; and demand, for that purpose, was made to the director of the customs, and, afterwards, to the emperor of *France*, through the minister, but without effect. The whole of their cargoes were put into *depot*, or the stores of the custom house, and were, afterwards, sold by the special order of the emperor, and the proceeds placed in his *caisse d'amortissement*, or sinking fund. That the *Mary* was consigned to *Parish & Co.*, and he did not believe that she could have departed without a special order from the emperor, and he did not believe that any such order could have been obtained; and his impression was that the consignees did endeavour to obtain such permission, through the agents of the government. The cargo of the *Mary* was placed, by the order of the director of the customs, in the *depot*, or custom-house stores, and under the direc-

NEWYORK, tion of the officers of the customs. The consignees could not
May, 1816. either sell or deliver the cargo; it was sold by order of the em-
GRACIE peror. The custom-house officers said they could not permit any
N. Y. INS. Co. *American* vessels, which had been boarded by *British* vessels, or
touched at *British* ports, to depart, without the special leave of
the emperor; and he believed the *Mary* could not have left
*Antwerp*, with her cargo, without such special permission. He
did not know whether force was used in landing the cargo, but
believed it was landed by direction of the custom-house officer.
The cargoes of all the seven vessels mentioned by him, including
the *Mary*, were landed and placed in *depot*, &c., under sequestra-
tion; and contrary, he believed, to the wishes of the consignees.
As to the vessels consigned to his house, he spoke positively. Re-
peated applications for permission to depart, with their cargoes,
were made without success. There was no prohibition, in this
respect, as to vessels which had not been boarded by *British*
ships of war, or touched at *British* ports.

The consignees, in their letter to the plaintiff, of the 23d of
*July*, 1807, after mentioning the arrival of the *Mary*, say, " they
are going to send all her papers to *Paris*, in order to obtain
leave to land her cargo." " The cargo will remain under the
control of the custom house, until a decision, which we have no
great hopes of being shortly given." In their letter of the 10th
of *August*, they write : " We are yet without any decision," &c.,
" nor have we obtained leave to land the *Mary's* cargo." In
*September* following, they again wrote : " Enclosed you will
find a printed note, by which you will see that our government
is fully determined to enforce the execution of the decree of the
21st of *November*." " Not long after we wrote you last, we
had leave to land the *Mary's* cargo." " We are apt to imagine
that something is still to be determined in regard to such vessels
whose cargoes have been landed, by permission of the director
general of the customs, authorized by the minister of finance.
Are those cargoes to be admitted or not ? Are they to be ad-
mitted under certain restrictions or conditions, or are they to be
sent back?" In their letter of the 14th of *April*, 1808, they say,
" We have not discontinued a moment doing every thing we
could to obtain the admission of the sequestered cargoes *per* the
*Perseverance* and *Mary*; but all without success." " We still
flatter ourselves that, whatever may be the decision which may
be pronounced hereafter, in regard to the *American* cargoes

seized in our ports, in consequence of the decrees of the 23d of *November* and 17th of *December*, 1807, there will be an exception made in favour of those which, like yours, have, previously to these decrees, been admitted, provisionally, by the minister of finance, and the director general of the customs." " We have petitioned to be permitted to re-export those cargoes; but we do not suppose it will be granted."

In their letter of the 30th of *May*, 1808, they wrote : " We continue in the same uncertainty as to the *sequestered cargoes;* no decision having yet been given." On the 4th of *August*, 1808, they again wrote : " We have the honour to inform you, that, by an imperial decree lately issued, it is ordered, 1st. That the cargoes entered into our ports, before the decrees of *November* and *December*, 1807, (which comprehend those under sequestration,) be sold immediately, by public sale, and the proceeds be paid into the *caisse d'amortissement.* 2. That an inquiry shall be made, in order to prove that the goods are not *British* property. 3. That the emperor reserves to himself the right of pronouncing on the result of such inquiry."

It appeared, from subsequent letters, that, after exhibiting the fullest proofs of *American* property, and various applications, no release of the cargo could be obtained; but it was, in *June*, 1810, sold by order of the emperor, and the proceeds paid into the *caisse d'amortissement.* On receiving information of the sale, the plaintiffs, on the 13th of *July*, 1810, made a formal abandonment to the defendants for a total loss.

*D. B. Ogden,* and *S. Jones,* jun., for the plaintiffs. They cited *Speir* v. *New-York Ins. Co.,* 3 Johns. Rep. 88. *Mumford* v. *Phœnix Ins. Co.,* 7 Johns. Rep. 449. 460. *Brown* v. *The Phœnix Ins. Co.,* 4 Binney's Rep. 445. 5 Binney, 403., *Savage* v. *Pleasants.*

*T. A. Emmet,* and *Wells,* contra.

PLATT, J. The plaintiff claims as for a total loss, under a policy of insurance upon the cargo of the ship *Mary,* on a voyage " at and from *New-York* to *Antwerp;* if blockaded, to a port not blockaded." " Warranted free from seizure, for, or on account of, any illicit or prohibited trade."

On her voyage the ship was captured by an *English* privateer,

and carried into *Portsmouth*, where she was liberated by a decree of admiralty, and then pursued her voyage.

On the 21st of *July*, 1807, she arrived at *Antwerp*, and moored off the city.

About the 1st of *September*, 1807, the cargo was landed at *Antwerp*; and, I think, the only question is, whether, *at the time it was so landed*, it was under the " *arrest, restraint*, or *detainment*" of the *French* government.

By the 7th article of the *Berlin* decree, (21st of *November*, 1806,) it was ordained, that " no vessel coming directly from *England*, or from the *English* colonies, or having been there since the publication of the present decree, shall be received into any port."

To go into a *French* port, for the purpose of requesting a special permission to land a cargo, upon a full explanation that the vessel had come directly from an *English* port, would not be a violation of the *Berlin* decree, whether such application were successful or not. For, if the *French* government refused permission to land the cargo, the legal consequence was, that the vessel had a right to depart with her cargo, and seek another market; and if permission for landing the cargo was granted, with a full knowledge that the vessel had come from an *English* port, such consent (by the emperor himself, as in this case) would be a revocation of that decree, in regard to that particular ship and cargo.

The 8th article of the *Berlin* decree provides, accordingly, that " every vessel contravening the above clause, by means of a false declaration, shall be seized; and the vessel and cargo confiscated, as if they were *English* property."

I can, therefore, see no ground to suppose that the cargo of the *Mary* was seized and condemned for a violation of the *Berlin* decree; especially as the decree of condemnation does not allege *that* as the cause. If the assured had committed an infraction of the *Berlin* decree, why was the *ship* permitted to depart? The penalty of that decree was a forfeiture of the *vessel*, as well as her *cargo*.

It is observable, that the *condemnation* of this cargo was not until *after* the *Milan decree* of the 11th of *November*, 1807, although the *sequestration* was long before that decree.

The *Milan* decree declares all foreign vessels *lawful prize,*

NEWYORK,
May, 1816.

GRACIE
v.
N. Y. INS. Co

which have submitted to be searched by an *English* ship, or have come from an *English* port.

The fair presumption is, that, in condemning this cargo, the emperor exercised a special arbitrary power, *ex post facto*, inasmuch as the case of the *Mary* was exactly within the policy of the *Milan* decree, although she came into the *French* port fifteen months before the date of that decree.

There is, therefore, no evidence of a breach of warranty, on the part of the assured, against " *illicit* and *prohibited trade.*"

But if the landing of the cargo were the voluntary and unconstrained act of the consignees, having the free election, either to send away the cargo, or to land it, then it is clear that the defendants are not liable, because their risk terminated upon the safe and unrestrained landing of the goods insured, at the port of destination.

That the cargo was sequestered, and, afterwards, sold by order of the *French* government, is undeniable; and the only material inquiry is resolved into a question of fact, viz. Was the seizure, or sequestration, in this case, *before the landing of the cargo?*

The testimony of *Richards*, the master, upon his direct examination, is clear and explicit, that when the *Mary* arrived in *Flushing* roads, there were two or three ships of war there; that an armed force was put on board the *Mary;* that they inquired of him whether he had been in *England;* that he informed them he had been captured and carried in there; that the armed force continued on board until the arrival of the ship at *Antwerp*, and until the landing of the cargo; and that he never had the control of the ship, nor the power of directing where she should go, until after the cargo was landed; that, on the 25th of *August*, 1807, (he understood,) permission was given to land the cargo, on condition that it should be deposited in the stores of the custom house; and it was landed and deposited accordingly.

The credit of the master is in some degree impeached by his confused and incoherent answers to the cross interrogatories; but it is strongly corroborated by the testimony of *Jacob Ridgeway*, then *American* consul residing at *Antwerp*.

He swears, that, at the time when the *Mary* lay at *Antwerp*, with her cargo on board, there were six other *American* vessels, with their cargoes, also lying there, all having, like the *Mary*,

touched at an *English* port on their voyage to *Antwerp ;* that four of those vessels were consigned to himself; and the other three, including the *Mary*, were consigned to *David Parish & Co.* He further swears, " that the said vessels, which came addressed to his house, and which had touched at *English* ports in their passage out, were not permitted to depart with their cargoes; that he demanded permission for the departure of their cargoes; the first demand was made to the director of the customs, and afterwards to the emperor of *France*, through the medium of his minister, *all without effect*." He further testifies, that, " to the best of his knowledge and belief, the whole of the cargoes of those seven vessels were put into the depot, or custom-house stores, and were, afterwards, sold by a *special order* of the emperor, and the funds arising from the sales placed in his *caisse d'amortissement*."

With regard to the ship *Mary*, he says, " I do not believe it was possible for her to have departed from *Antwerp*, with her cargo, for any other port, without the special permission of the emperor of *France*. I do not believe that any such permission could have been obtained ; and the impression on my mind is, that the consignees (of the *Mary*) did make efforts to obtain such permission." Mr. *Ridgeway* further testifies, that " the cargo of the *Mary* was deposited by order of the directors of the customs in the depot, or custom-house stores, and under the control of the custom-house officers. The consignees could not, to the best of his knowledge and belief, either sell or deliver said cargo ;" and " this cargo was sold by *special order* from the emperor ;" that " the reason assigned by the custom-house officers, for not permitting *American* vessels that had either been boarded by *British* ships of war, or touched at *British* ports, to depart with their cargoes, was, that they could not do it without the special permission of the emperor." He further adds, that " the cargoes of the seven vessels were all landed and put into the depot, under sequestration, as he believes, contrary to the wishes of the consignees."

*Ridgeway's* official station afforded him the best means of knowing, and it was his duty, as *American* consul, to ascertain the truth on that point. He swears, that on inquiry at the proper office, he was told, that " *American vessels* having touched in *England*," &c., could not be permitted to depart with their cargoes, without special permission of the emperor. I consider

this declaration as strong evidence, in itself, of " restraint," upon this vessel, to which the language of the public officer was expressly applicable. " Arbitrary restraint of princes" is often exercised in an equivocal and insidious manner; and it may not be the less certain, although the evidence of it be not frankly and palpably addressed to our senses. The testimony of *Ridgeway*, although less positive and direct, in regard to the *Mary*, is positive proof, to show that the three cargoes consigned to him were under arbitrary restraint; and that fact alone greatly strengthens the credibility of Captain *Richards*, who swears, positively, as to the like restraint upon the cargo of the *Mary ;* all those cargoes being in the like predicament.

NEWYORK,<br>MAV, 1816.<br><br>GRACIE<br>v<br>N. Y. INS. Co.

The extracts of letters from *David Parish & Co.*, to the plaintiff, are not inconsistent with the testimony of Captain *Richards*, and that of Mr. *Ridgeway*. These letters do not expressly state when, and how, the seizure of this cargo was made ; but they speak of it as " *under sequestration,*" before the decree for its sale ; and, if *sequestered,* when did that take place ? It remained in the depot, under the entire control of the government, from the moment of its landing until the decree of sale ; and whether the sequestration took place as soon as the vessel arrived in the *Scheld,* or at *Antwerp,* as may be inferred from the testimony of *Richards* and of *Ridgeway,* or whether the cargo was sequestered while in the very act of landing, it was equally covered by the policy.

It is worthy of remark, that the letters of *David Parish & Co.* were written while they were within the reach of the strong and despotic arm of *Napoleon ;* and that all their letters were liable to his inspection ; which may account for their writing as *little,* and as *seldom,* as possible, of the violent acts of the *French* government. Especially, as they were, during all that time, most humbly supplicating the clemency of *Napoleon,* in regard to this very cargo. It would, therefore, have been impolitic and unsafe to have written the plain truth, that these goods were seized as soon as they came within the power of the *French* government; not for the violation of any law, but as an act of capricious and arbitrary despotism. From the whole tenor of their letters, however, I cannot entertain a doubt, that, if interrogated expressly upon the point, they would have sworn, in accordance with the other witnesses, that the cargo was held under the control of the government, so that it could neither be

landed nor exported, by the owner, at any time after its arrival at *Antwerp.*

It appears that the cargo was landed upon the express application and request of the consignees, under a condition that it should remain in the *depot,* under the control of the custom house, until the emperor's decision should be made. But if the cargo was under *arrest* or *sequestration* while it remained on board the ship, in port, the benefit of this policy was not waived, nor lost, by consenting to the landing of the cargo under the restriction imposed. The petition to land the goods, under such circumstances, was a request merely to *modify the restraint,* already imposed by the government, by removing the sequestered cargo from the ship to the store house; both equally within the territory and control of the *French* government. The fair and legitimate object of that modification, undoubtedly, was, that the *ship might depart;* to which there was then no impediment.

I think the decided weight of evidence establishes the fact, that the cargo of the *Mary* was lost to the assured, by the " *arrest, restraint, or detainment*" of the *French* government, without any breach of warranty against " *illicit or prohibited trade*" on the part of the assured; and, therefore, the plaintiff is entitled to recover.

YATES, J., and VAN NESS, J., were of the same opinion.

THOMPSON, Ch. J. The decision of this case depends entirely upon the *question of fact,* whether there was a voluntary landing of the cargo, or whether it was landed under the coercion of the force stated by the master to have been put on board. If the facts in the case will warrant the conclusion, that the *Mary* was seized by a military force, and the cargo landed under such constraint, and against the consent of the consignees, I should entertain no doubt but that the underwriters were liable for the loss. This was not a seizure or detention for, or on account of, any illicit or prohibited trade. There was no attempt whatever to trade, or to do any act in contravention of any municipal regulation. A mere entry into the port of *Antwerp* was no breach of that warranty. Nor could there be any pretence to charge the assured with a violation of the *Berlin Decree.*

That decree declares, that no vessel coming directly from *England,* or her colonies, or having been there since the publi-

cation of the decree, shall be admitted into any port of the *French* dominions; and that every vessel that, by a false declaration, contravenes the foregoing disposition, shall be seized, and the ship and cargo confiscated as *English* property." There was no pretence that there was any attempt, on the part of the assured, to obtain an entry in violation of this decree. If, therefore, this cargo was forcibly taken from under the control of the master and consignees, it was a lawless and arbitrary act, and the loss would come under the general peril of arrests and detention of princes. But if, on the contrary, the conclusion to be drawn from the facts in the case is, that the consignees, finding that the *Mary* came within the *Berlin Decree*, and that they could not procure an unconditional entry and landing of the cargo, voluntarily consented to have the same deposited in the stores of the custom house, for the purpose of procuring a dispensation of the decree, and permission to sell the cargo, the underwriters are not responsible for the subsequent loss. If the consignees chose to speculate upon the chance of obtaining a relaxation of the decree, they must do it at the risk of the assured, and not of the underwriters. *And*, with respect to this question of fact, very considerable doubt may well be entertained. Much depends upon the credibility of the master, who certainly appears, in the case, to have exposed himself to very considerable suspicion; and I very much regret that such a case is presented to the court for decision; it more properly belonged to the determination of a jury. This is enforced by the circumstance, that there is a provision for turning the case into a special verdict, which certainly cannot be done, if my understanding of the point on which the cause will turn be correct. The jury must find that fact; and not merely state the evidence of the fact. The conclusion is to be drawn by them, and not by the court. But, as the parties have seen fit to submit the case to the court, in its present shape, it becomes necessary to weigh the evidence, and draw such conclusion as, in my judgment, it will warrant.

The testimony of the master, and the inference to be drawn from the letters of the consignees, would certainly seem to warrant very opposite conclusions. The master states, that on the *Mary's* being moored off the city of *Antwerp*, an armed force was put on board, and continued there until after the landing of the cargo; that the control of the ship was entirely

NEWYORK,
May, 1816.

GRACIE
v.
N. Y. Ins. Co.

taken from him; and that this armed force was kept on board by the custom-house officers, in consequence of the *Mary's* having been carried into *England*. He states nothing of this, however, in his protest, and gives no satisfactory explanation why he did not. An attentive examination of the testimony of *Ridgeway*, would seem to warrant the conclusion, that the custom-house officers would not permit vessels that had touched in *England* to depart, without the special permission of the emperor; he, as consignee in several cases, had failed in obtaining such permission. There is no evidence, however, that such permission was asked, in this case, until some time in the year 1808. But none of the letters from the consignees seem even to hint that there was any compulsion in landing the cargo; and it is hardly conceivable, if that had been the case, that the consignees would not have mentioned so important a circumstance. The drift of all their letters, is to show that they were using every exertion to obtain *permission* to land the cargo. The *Mary* arrived on the 21st of *July*, and the cargo was not landed until the 25th of *August*. On the 23d of *July* the consignees write, "We are going to send all her papers to *Paris*, to obtain leave to land her cargo." And on the 10th of *August* they again write, that they had not yet obtained leave to land the *Mary's* cargo; not an intimation of any difficulty of sending away vessel and cargo; or of asking leave for that purpose. On the 11th of *September*, they enclose a printed note, announcing the determination of the *French* government to enforce the execution of the *Berlin Decree*, although the vessel might have been forcibly carried into *England*; and that a *Portuguese* vessel had already been sent away. They then say, "not long after we wrote you last, we had *leave* to land the *Mary's* cargo, which was done in three days, without any *molestation*;" and they go on to state, that "something is still to be determined in regard to vessels whose cargoes have been landed by *permission* of the director general of the customs." In the letter of the 14th of *April*, 1808, after speaking of seizures under the *Milan Decree*, they say, "there will be an exception made in favour of those which, *like yours*, have, previously to those decrees, been *admitted provisionally* by the minister of finance." And in this letter, for the first time, they speak of having made application to be permitted to re-export the cargo. From an examination of these letters, it is difficult, if not impossible, to resist the conclusion, that the cargo of the

*Mary* was landed, at the earnest and pressing solicitation of the consignees, who, finding that they could not obtain an unconditional entry, procured the cargo to be *admitted provisionally*, as they term it; to remain in custody of the custom-house officers, until the determination of the emperor should be known on the subject; and this may account for there having been put on board a military force, by the custom-house officers, for its safe keeping. The captain says it was landed on condition that it should be deposited in the stores of the custom house; and *was landed in pursuance of orders from the consignees*, who gave him a receipt for the same. A clerk of the consignees and a custom-house officer both attended to take an account of the cargo. All this shows, very evidently, that the landing was under, and pursuant to, some arrangement made by the consignees, and not by any compulsion; the consignees, probably, calculating upon their exertions and influence to obtain a relaxation of the decree; and that it would be better to procure a provisional landing than to send back the cargo at that time, thinking, probably, that this course might be resorted to after every other attempt should fail. For, in their speculations on the result, with respect to cargoes in this situation, they, in their letter of the 11th of *September*, consider them in one of three predicaments; either to be admitted unconditionally, or under certain restrictions, or to be sent back. And thus we see the reason why no mention is made of an application to re-export the cargo until *April*, 1808; all attempts, probably, to effect any thing better had failed, and this was resorted to as the last alternative. If I were setting as a juror to weigh the evidence in this cause, and draw inferences from the facts stated, I should be bound to say the weight of evidence is in favour of the conclusion that the cargo was landed voluntarily, under an arrangement between the consignees and the officers of the *French* government, with a view to some future negotiations with the emperor; and that, of course, the underwriters were not responsible for the loss. But I think, as I suggested upon the argument, that it is a cause which belongs to a jury to decide, and ought to be sent back for that purpose.

SPENCER, J., was of the same opinion.

Judgment for the plaintiff.